

The following constitutes
the order of the court. Signed July 13, 2017

Charles Novack
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 09-57539 CN |
| JOSHUA L. HEDLUND, | Chapter 7 |
| Debtor. | |
| TRACY HOPE DAVIS, UNITED STATES Trustee, | Adversary No. 10-5315 CN |
| Plaintiff, | **MEMORANDUM DECISION AFTER TRIAL** |
| vs. | |
| JOSHUA L. HEDLUND, | |
| Defendant. | |

Over a five day period, this court conducted a trial in the above adversary proceeding in which plaintiff United States Trustee (the "Trustee") sought to deny debtor and defendant Joshua Hedlund's Chapter 7 discharge under Bankruptcy Code §§ 727(a)(2)(A) and (a)(4). While this adversary proceeding was filed more than seven years ago and has had its fair share of twists and turns, the Trustee's arguments are straightforward: Hedlund committed numerous false oaths by failing to disclose all of his property interests on his bankruptcy schedules and statement of financial affairs, and he concealed his ownership interest in numerous assets with the intent to hinder, delay or defraud his creditors. Hedlund denies the Trustee's allegations, and argues, among other things, that

1

**727(a)(4)(A) DECISION**

he was incarcerated when his bankruptcy was filed and did not authorize or ratify his bankruptcy filing, that he was represented by incompetent counsel who repeatedly failed to obtain the information necessary to complete his Chapter 11 and (later) his Chapter 7 bankruptcy documents, and that he cooperated with the Chapter 7 trustee and tried to disclose all necessary information to him and the Chapter 7 trustee's counsel. The Trustee has met her burden of proof, and for the reasons stated below, this court denies Hedlund's Chapter 7 discharge.

The following constitutes this court's findings of fact and conclusions of law under F.R.B.P. 7052(b). Defendant Joshua Hedlund is a college educated, experienced real estate investor who, in the early 2000s, owned for development (either directly or through various limited liability entities) significant acreage in Humboldt and Mendocino County in Northern California. Hedlund also owned a house and adjacent, undeveloped land in Santa Cruz, California. While Hedlund employed a bookkeeper, Stacy Speelman (who also provided some property management services), and frequently used the services of a real estate loan broker, Wendy Feltzer, to address the financial needs of his real estate holdings, Hedlund was the controlling figure in all of his real estate enterprises, which involved several limited liability companies and trusts. Hedlund was the sole person who fully understood their organizational structure, holdings, and liabilities. To a third party, be it this court or a Chapter 7 trustee, his real estate investments are difficult to decipher.

Hedlund's financial difficulties began in 2006 when he was indicted on numerous criminal offenses by the U.S. Attorney's Office for the Northern District of California for allegedly participating in a marijuana grow and distribution scheme. Hedlund eventually pled guilty to reduced charges and began serving a thirty three month sentence in May 2009. Until he was released in December 2011, Hedlund's ability to manage his real estate holdings was significantly curtailed. While Speelman initially visited Hedlund several times a month in the Lompoc, California federal prison camp, Hedlund was subsequently placed in solitary confinement and moved to a federal prison in Minnesota. His communication privileges were restricted for several months, and when restored, were essentially limited to emails and phone calls to counsel.

Before surrendering, Hedlund took some steps to ensure that his real estate holdings would remain intact. For example, Hedlund executed certain limited power of attorneys to his brother (Ben

2

Hedlund), mother, and his long-time girlfriend. He did not, however, provide Speelman with a power of attorney.

Hedlund's Chapter 11 case was filed on September 4, 2009 as a "skeletal" bankruptcy filing to stay the foreclosure of Hedlund's Santa Cruz properties. Judson Farley, a long-time bankruptcy attorney, filed the bankruptcy on his behalf. Hedlund was incarcerated when Farley filed the Chapter 11, and Hedlund did not review the bankruptcy petition or initial bankruptcy schedules and statement of financial affairs before they were filed. There is little question, however, that Hedlund orchestrated his bankruptcy filing. Speelman testified that Hedlund instructed her to file a Chapter 11 bankruptcy for him if she could not prevent the foreclosure of his Santa Cruz properties, and to provide all necessary information to the bankruptcy attorney that she hired. After notices of sale were posted on the Santa Cruz properties, Speelman hired Farley and provided him with the information that he used to complete the original bankruptcy petition, schedules, and statement of financial affairs. Speelman did not, however, sign the bankruptcy petition, schedules, or statement of financial affairs on Hedlund's behalf, and she informed Farley that he needed to discuss this directly with Hedlund. Speelman also testified that Hedlund wanted to work with Farley directly, and that he never asked her to sign the bankruptcy documents prepared by Farley.

Hedlund's original bankruptcy schedules and statement of financial affairs were woefully incomplete. While his Bankruptcy Schedule A listed his Santa Cruz properties, his Schedule B and Statement of Financial Affairs listed interests in only three LLCs - Schmook Ranch, LLC, H & H Management, LLC ("H & H Capital"), and Ruby Creek Ranch, LLC - and his Schedule B did not list any vehicles or equipment. Hedlund actually held or claimed membership or equitable interests in several unscheduled real estate LLCs or trusts which controlled thousands of acres of land in Northern California. These unscheduled entities included the Larabee Land and Cattle Trust and Villica LLC.[1] Hedlund believed that these real estate entities had substantial equity. Hedlund also

---

[1] Of these entities, Schmook Ranch, LLC filed a Chapter 11 in June 2009, Larabee Land and Cattle Trust filed a Chapter 11 in February 2010, and Vilica, LLC filed a Chapter 11 in February 2011. These cases were filed by Speelman or Hedlund's brother, Benjamin Hedlund. The evidence strongly suggests that Hedlund instigated and directed these entities while they were in Chapter 11.

3

**727(a)(4)(A) DECISION**

owned an all terrain Mercedes Benz Unimog vehicle used in his land development projects, and

further claimed - but failed to disclose on his Schedule B - that Schmook Ranch LLC owed him $1.4

million. *See* Trustee's Exh. 82. The poor quality of Hedlund's original bankruptcy documents is not

surprising. Speelman was not privy to all of the intricate specifics of Hedlund's real estate holdings

and investments, and Farley did not contact Hedlund before he filed these documents to verify that

he was authorized to file Hedlund's Chapter 11 or to confirm the accuracy of the bankruptcy

schedules and statement of financial affairs[2].

Hedlund promptly contacted Farley after he learned of his Chapter 11 bankruptcy filing. This

correspondence, if nothing else, demonstrates that Hedlund sought and supported the bankruptcy

filing and wanted his schedules to be accurate in order to obtain the full protection afforded by the

automatic stay. For example, in a September 9, 2009 letter to Farley, Hedlund writes:

Dear Judson: Stacy [Speelman] filed Chapter 11 bankruptcy with you on my behalf. Please send me

a copy of all documents that have been filed. Please request copies of all financial documents from

Stacy that I filed in my federal criminal case, please send them as well. . . . I just sent Stacy a long

letter which I would like to be sent by you to Washington Mutual: Chase Bank. Please contact her . .

. to get a copy of the letter. I look forward to meeting you on the phone or otherwise, and thank you

for representing me. As soon as I am in possession of financial documents (sent by you) showing my

current assets and liabilities, as well as my current credit report, I will lay out a plan of action to

ensure all creditors are paid."

Hedlund repeated his request for all filed documents in a short letter to Farley dated

September 23, 2009, in which he also stated his "concern[] that some properties I hold in a living

---

*See*, e.g., Trustee's Request For Judicial Notice No. 6. These bankruptcy filings demonstrate that
Hedlund was well aware of his responsibilities as a debtor and debtor-in-possession in his
bankruptcy.

[2] The Trustee argues in her closing brief that Hedlund may also have interests in several
other trusts and LLCs, and failed to disclose some assets which he listed in a pre-petition loan
application that he submitted to Stonecrest Financial. The Trustee never proved by a preponderance
of the evidence that Hedlund held any property interest (cognizable under Bankruptcy Code §
541(a)) in any of these other entities or in the disputed property listed on the loan application.

4

**727(a)(4)(A) DECISION**

1    trust may not have been submitted." He repeated this concern in a September 29, 2009 letter to

2    Farley, in which he advised Farley that he had received a three day notice for his commercial tenancy

3    in Santa Cruz, and that "this lease should be in my personal bankruptcy. I still have not received a

4    copy of what was submitted to the court. I want to make sure that my bankruptcy is true and correct.

5    Please send me what has been submitted at your earliest convenience."

6           While there is no evidence that Farley responded to Hedlund's document requests, Speelman

7    testified that she sent the petition, schedules and statement of financial affairs to Hedlund

8    immediately after Farley filed them. There is little reason for this court to question Speelman's

9    testimony on this point. Speelman had worked for Hedlund for several years before his Chapter 11

10   bankruptcy filing, and was, by all accounts, a trusted employee. She assisted Hedlund not only in his

11   personal bankruptcy, but also in the 2010 Chapter 11 bankruptcy filings of several LLCs in which

12   Hedlund was the controlling member. Moreover, Hedlund acknowledged that he reviewed (in some

13   form or fashion) his bankruptcy documents while he was incarcerated. His familiarity with these

14   documents is manifested in numerous letters and pro se bankruptcy pleadings (that he wrote and/or

15   filed within a year of his bankruptcy filing), all of which state that his bankruptcy documents were

16   inaccurate and required significant amendments. *See*, *e.g.*, Trustee's Exhs. 11, 12, 120, and 122.

17   Indeed, in a June 15, 2010 letter to Richardson, Hedlund informed him that he is "currently

18   attempting to reproduce accurate bankruptcy schedules of my personal debts."

19          Despite these admissions and representations, Hedlund only amended his Bankruptcy

20   Schedules A and D once (on November 18, 2010) to list an interest in real property located at 1777

21   Sprowell Creek Road, Garberville, California and the associated secured debt. *See* Trustee's Exh. 4[3].

22   Hedlund admitted at trial that he filed these amendments after learning that the Garberville property

23   was subject to foreclosure proceedings. Tellingly, H & H Capital owned the Garberville property up

24   until November 2010, when it transferred title to Hedlund who promptly sought to use the automatic

25

26

---

27          [3] Hedlund also instructed Farley to amend the schedules to add his interest in a Santa Cruz
     commercial lease to address an unlawful detainer action filed by the landlord. Farley complied with
28   this request and filed an amended Schedule G on November 2, 2009. *See* Trustee's Exhs. 3 and 7.

**727(a)(4)(A) DECISION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  stay to prevent its foreclosure.  *See* Trustee's Exh. 34.[4]  Hedlund never amended his Schedule B or

2  Statement of Financial Affairs to list any additional LLC memberships or equitable interests in any

3  trusts.

4      Hedlund's Chapter 11 case was converted to Chapter 7 on March 12, 2010.  John Richardson

5  was appointed as the Chapter 7 trustee, and he retained Charles Maher, an experienced trustee

6  counsel (then with the Luce Forward law firm) to represent him.  Maher's investigation into

7  Hedlund's assets was stymied by Hedlund's failure to amend his bankruptcy schedules.  Rather than

8  file amended schedules A and B to list his interest in his numerous real estate entities and personal

9  property, Hedlund contended that he had disclosed all of his holdings to the United States Probation

10  Department and Department of Justice as part of his guilty plea, and that Maher should obtain the

11  necessary information from these entities.  This disclosure was an inadequate substitute for amended

12  bankruptcy schedules, as the United States government refused to release this information to Maher.

13  Hedlund also informed Maher that the Baker & McKenzie law firm had conducted a thorough tax

14  audit which also would disclose his assets and liabilities.  In an August 5, 2010 email, Hedlund

15  instructed Scott Frewing (a Baker & McKenzie tax attorney) to release his personal tax returns and

16  certain LLC returns to Maher and Richardson.  While Frewing's reply email indicates that he sent

17  the returns for two LLCs and Hedlund's personal 2005 and 2006 tax returns to Richardson and

18  Maher, Maher testified that he did not specifically recall receiving them.  Moreover, this court does

19  not know how useful these returns would have been to Maher.  Simply, rather than file amended

20  bankruptcy schedules to list all of his real and personal property, Hedlund required Maher and

21  Richardson to ferret out this information.  While Hedlund did provide Maher with some specific

22

23      [4]  The Trustee also asserts that Hedlund claimed to have interests in several promissory notes

24  and real property parcels purportedly held by or in some of the various LLCs and trusts that he
managed.  *See*, *e.g*., Trustee's Exh. 119B.  Exhibit 119B is a December 23, 2009 email from

25  Hedlund to Wendy Fetzer in which he lists various assets which could be sold or refinanced to
"generate enough funds to bring current all of our lenders."  This email certainly illustrates the

26  complexity of his real estate investments and his absolute control over the various entities which
owned these assets.  Given his use of the word "We" when describing them, this email does not,

27  however, prove that he was on title to the real estate in question or was the payee of the notes.  The

28  Trustee concedes as much in her closing brief.

6

**727(a)(4)(A) DECISION**

1  information regarding assets and liabilities, the release of information was sometimes associated

2  with a pending foreclosure. For example, on May 21, 2010, Hedlund informed Maher by letter that

3  he and H & H Capital had "significant equity in heavy industrial construction equipment that was

4  purchased from Komatsu Financial. My understanding is that this equipment has been repossessed

5  by agents of Komatsu. I believe that the automatic stay in my personal bankruptcy proceeding

6  should extend to this equipment and any related lawsuit. . . . I want to make sure that the equity in

7  this equipment is used to pay my Unsecured Creditors. I am concerned that Judson Farley has not

8  accurately disclosed in the schedules that I have multiple unsecured creditors. I have made a

9  complete disclosure to the DOJ and US Probation in my criminal case." Maher thereafter

10  investigated this matter, only to learn that H & H Capital owned the equipment and that Hedlund had

11  only guaranteed the debt. Hedlund also informed Maher that he had an equitable interest in the

12  Garberville property, for which he did amend his Schedule A in November 2010. Maher thereafter

13  filed an adversary proceeding to stay the foreclosure, which he later dismissed. None of the property

14  pursued by Maher in reliance on Hedlund's statements generated any funds for the bankruptcy estate.

15  While Maher continued to work on the Hedlund Chapter 7, he eventually stopped recording his time

16  due to the futility of his efforts.[5]

17       Hedlund also testified that he spent a significant amount of time at county recorder offices

18  locating documentation which he provided to Maher or the trustees in the bankruptcies filed by some

19  of his entities. Again, what he failed to do, however, is simply amend his bankruptcy schedules and

20  statement of financial affairs and allow Maher to investigate these assets in his own manner.

21  1.  Ratification of the Chapter 11 Filing

22       Hedlund argues that this court should dismiss this adversary proceeding because he never

23  _____

24       [5] The complexity of Hedlund's real estate related holdings and the need for complete
     bankruptcy schedules are fully detailed in Hedlund's "Opposition to Motion For Order For

25  Substantive Consolidation" that he filed *pro se* from Sandstone federal prison in August 2010
     (Trustee's Exh. 24). The consolidation motion was filed by Richardson, who sought to consolidate

26  Hedlund's bankruptcy estate with H & H Capital, Vilica, LLC, San Geronimo Salmon Trust, Fire
     Hill Conservation Trust, Full Recourse Payment Trust, Schmook Ranch Trust, and the West Family

27  Trust (all of which are entities in which Hedlund held an interest or is thought to have held an

28  interest). Richardson later withdrew the motion.

727(a)(4)(A) DECISION

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1 authorized his Chapter 11 filing. This court declines to so, and instead finds that he ratified the

2 Chapter 11 bankruptcy filing. Ratification is the voluntary election by a person to adopt in some

3 manner as his own an act which was purportedly done on his behalf by another person, the effect of

4 which, as to some or all persons, is to treat the act as if originally authorized by him. Rakestraw v.

5 Rodrigues, 8 Cal. 3d 67, 73 (1972). An unauthorized bankruptcy filing may be ratified by the

6 debtor's subsequent conduct. *See* Hager v. Gibson, 108 F.3d 35, 39-40 (4th Cir. 1997). The record is

7 replete with facts substantiating that Hedlund sought and approved of the bankruptcy filing.

8 Hedlund instructed Speelman to file a bankruptcy if his secured creditors posted his Santa Cruz

9 properties, thanked Farley for filing the Chapter 11 and sought to direct his actions in the case,

10 regularly participated in his Chapter 11 and then his Chapter 7 case by submitting pleadings and

11 making telephonic appearances (*see* Farley's deposition testimony), and used his personal

12 bankruptcy filing when it benefitted him to do so.[6] The more critical question, is whether his

13 conduct justifies the denial of his discharge.

14 2. Denial of Discharge

15     Bankruptcy Code § 727(a)(4)(A) provides in pertinent part that "The court shall grant the

16 debtor a discharge unless . . . the debtor knowingly and fraudulently, in or in connection with the

17 case –(A) made a false oath or account. . . ." This court may deny a Chapter 7 debtor's discharge if

18 1) the debtor made a false oath in connection with the case; 2) the oath related to a material fact; 3)

19 the oath was made knowingly; and 4) the oath was made fraudulently. Plaintiffs must establish these

20 elements by a preponderance of the evidence. In re Retz, 606 F.3d 1189, 1197 (9th Cir. 2010) (*citing*

21 Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (9th Cir. BAP 2005)); In re Coombs, 193 B.R.

22 557, 560 (Bankr. S.D. Cal. 1996) (*citing* In re Bodenstein, 168 B.R. 23, 27 (Bankr. E.D.N.Y.1994)).

23 This code section is liberally construed in a debtor's favor and strictly against the party seeking to

24 deny the discharge. In re Retz, 606 F.3d 1189 (9th Cir. 2010).

25

26     [6] As stated above, Hedlund amended his Schedules A and D to list the Garberville property
and avoid a foreclosure. Hedlund also executed - but apparently did not file - another amendment to

27 his Schedule A to protect real property owned by the West Family Trust in which he claimed a
"percentage" interest. *See* Trustee's Exh. 119. Hedlund testified that he created the West Family

28 Trust for his children.

8

727(a)(4)(A) DECISION

A false oath may involve an affirmatively false statement or an omission from a debtor's

bankruptcy schedules or statement of financial affairs. Searles v. Riley (In re Searles), 317 B.R. 368,

377 (9th Cir. BAP 2004) (citations omitted), *aff'd*, 212 Fed.Appx. 589 (9th Cir.2006). A material

fact is one that "bears a relationship to the debtor's business transactions or estate, or concerns the

discovery of assets, business dealings, or the existence and disposition of the debtor's property." In

re Khalil, 379 B.R. 163, 173 (9th Cir. BAP 2007). Notwithstanding this broad definition, a "false

statement or omission that has no impact on the bankruptcy case is not material and does not provide

grounds for relief for denial of a discharge under § 727(a)(4). *Id*. at 172. An act is done "knowingly"

when the debtor acts "deliberately or consciously." *Id* at 173. Finally, a false oath or omission is

fraudulent when the debtor makes a misrepresentation or an omission that at the time he or she knew

was false with the intention and purpose of deceiving creditors. *Ibid*. Courts typically rely on

circumstantial evidence to demonstrate this intent. In re Devers, 759 F.2d 751, 753-54 (9th Cir.

1985). Recklessness alone does not establish a debtor's fraudulent intent. It can, however, form a

part of the circumstantial evidence typically used to establish fraudulent intent, along with a pattern

of falsity. Khalil, 379 B.R. at 174-75.

The goal of § 727(a)(4) is transparency. "The fundamental purpose of § 727(a)(4)(A) is to

insure that the trustee and creditors have accurate information without having to conduct costly

investigations." Khalil, 379 B.R. at 172. Bankruptcy schedules "call for the truth and an accurate

itemization of the debtor's assets and of the values of debtor's assets," and "a debtor has a

continuing duty to assure the accuracy of his schedules; the proper method of correction is a formal

amendment of the schedules." In re Pynn, 546 B.R. 425, 430 (Bankr.C.D.Cal. 2016).

This court could not find any case where a debtor who ratified his bankruptcy filing was

denied his Chapter 7 discharge because his original schedules, which were prepared without his

assistance, contained false oaths.[7] Hedlund craved control and privacy, and his ability to manage his

---

[7] The only case that the court located where a debtor ratified a bankruptcy filing and then
was denied a Chapter 7 discharge is First State Bank of Newport v. Beshears (In re Beshears), 196
B.R. 468 (Bankr.E.D.Ark. 1996). The debtor who lost her discharge in this joint bankruptcy was not
accused, however, of a false oath under § 727(a)(4)(A).

9

**727(a)(4)(A) DECISION**

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

personal bankruptcy filing and submit accurate bankruptcy documents was compromised by his stint in solitary confinement, overall communication restrictions, and Farley's breathtakingly inadequate legal work. Regardless, the Trustee has met her burden of proof.

Typically, a false oath is complete when made, i.e. when the offending bankruptcy schedule or statement of financial affairs is filed. Here, the false oath was "made" by Hedlund after he reviewed the bankruptcy schedules and statement of financial affairs, acknowledged that they were incorrect, and then failed to file or attempt to file accurate schedules and statement of financial affairs. Hedlund cannot reap the benefits of the bankruptcy (the automatic stay, among others) without accepting its burdens, which include filing accurate bankruptcy documents. Hedlund repeatedly acknowledged that his schedules were inaccurate, yet he filed only one amendment to Schedule A, which sought to include an asset which was not property of his bankruptcy estate.[8] Moreover, Hedlund's incarceration did not prevent him from correcting his schedules. Hedlund prepared and filed numerous pleadings in his personal bankruptcy (and the bankruptcies of his related LLCs and trusts) while in prison, and he surely could have amended his schedules after he was released in December 2011. Accordingly, the Trustee has proven that Hedlund made false oaths.

Hedlund's false oaths also related to material facts. Hedlund believed that the assets omitted from his bankruptcy schedules and statement of financial affairs had significant value. The same is true with regard to the Garberville property amendment. Hedlund valued the Garberville property on his amended Schedule A at $640,000, with $540,000 of debt against it.

Furthermore, there is little question that Hedlund knowingly omitted to list a) his interests in Villica LLC, Larabee Land and Cattle Trust, and b) Unimog vehicle, and c) his substantial dollar claim against Schmook Ranch, LLC, and knowingly sought to include the Garberville property in his Chapter 7.

---

[8] H & H Capital, LLC transferred the Garberville property to Hedlund after his Chapter 11 was converted to Chapter 7. The property therefore was not property of his Chapter 7 bankruptcy estate under Bankruptcy Code § 541. This amendment was also an "affirmative" false oath, since the Garberville property was not property of the estate and the amendment was made solely to stay the Garberville property's foreclosure.

10

**727(a)(4)(A) DECISION**

1    Finally, the Trustee has proven that Hedlund's conduct was fraudulent. Hedlund amended

2    his Schedule A to include the Garberville property even though he was never on title before his case

3    was converted to Chapter 7, all in an effort to stop its foreclosure. Such action is the epitome of

4    deceptive conduct, and it alone is sufficient to deny Hedlund's discharge under § 727(a)(4)(A).

5    Hedlund's material omissions, while more perplexing, were also deceptive. Despite his stated desire

6    to pay his creditors in full, Hedlund disclosed his real and personal property interests only in a

7    manner and order that he deemed appropriate. Hedlund's Chapter 7 case was the means by which to

8    satisfy his creditors, and his failure to file accurate schedules underscores that his real desire was to

9    reveal as little as possible in order to retain as much control as possible over the outcome. While the

10   Trustee did not fully explain why Hedlund's conduct did not match his words, this court need not

11   ascertain his true motivation. *See* Khalil at 176. Hedlund indicated during trial that his unease with

12   amending his schedules and statement of financial affairs related to the conditions of his supervised

13   release from federal prison, and the possibility (real or imagined) that his jail term would be

14   extended if some one argued that his bankruptcy schedules and statement of financial affairs were

15   inconsistent with the information he provided to the Department of Justice. While this court

16   understands Hedlund's self-described "paranoia" about avoiding a prolonged incarceration, this does

17   not excuse his failure to comply with another federal decree - the Bankruptcy Code. Moreover, the

18   only District Court order admitted into evidence that addressed this issue is an "Order For

19   Modification Of Supervised Release" signed by United States District Court Judge Yvonne

20   Gonzalez Rogers on July 25, 2013 - almost four years after Farley filed the Chapter 11. Simply, the

21   scale of his omissions, combined with his repeated failure to amend his schedules and statement of

22   financial affairs, his several statements to Maher that Maher should seek out the information on his

23   own, his attempts to list property which he did not own to improperly invoke the automatic stay,

24   along with his propensity for privacy and control, lead this court to find that Hedlund intentionally

25   and knowingly failed to disclose all of his financial holdings to Maher and Richardson in order to

26   somehow retain control over their disposition. This is deceptive conduct. The court takes judicial

27   notice that six years after the case was converted to Chapter 7, Richardson filed a "no asset" report.

28        Accordingly, Hedlund's Chapter 7 discharge is denied under Bankruptcy Code

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

11

**727(a)(4)(A) DECISION**

Case: 10-05315    Doc# 144    Filed: 07/13/17    Entered: 07/13/17 15:34:37    Page 11 of
13

§ 707(a)(4)(A).

The Trustee also seeks to deny Hedlund's discharge under Bankruptcy Code § 727(a)(2)(A). This code section authorizes the denial of a discharge if the debtor transferred, removed, destroyed, mutilated, or concealed his/her property within one year of the petition date with the intent to hinder, delay or defraud creditors.

The Trustee has not met her burden of proof on this claim for relief. The Trustee has not demonstrated by a preponderance of the evidence which personal assets Hedlund (allegedly) concealed from creditors with the intent to hinder, delay or defraud within a year before the petition date[9].

The Trustee shall prepare an appropriate judgment.

**\* \* \* END OF ORDER \* \* \***

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

---

[9] The evidence submitted by the Trustee presumably was meant to address a claim for relief under § 727(a)(2)(B). The Trustee's complaint, however, included a claim under § 727(a)(2)(A), and the Trustee's motion for a default judgment and the Trustee's post-trial brief similarly referred to § 727(a)(2)(A). The Trustee filed this adversary proceeding in September 2010 and never moved to amend her complaint.

12

**727(a)(4)(A) DECISION**

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COURT SERVICE LIST**

Joshua L. Hedlund
530 Hampshire Street, Suite 300
San Francisco, CA 94110

Other Recipients are ECF participants

13

**727(a)(4)(A) DECISION**